**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>ODN I Perfurações Ltda., *et al*.,[1]<br><br>Debtors in a Foreign Proceeding | Chapter 15<br><br>Case No. 23-10557 (DSJ)<br><br>(Jointly Administered) |

### DECLARATION OF ROGERIO LUIS MURAT IBRAHIM IN SUPPORT OF THE MOTION FOR (I) RECOGNITION OF FOREIGN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, (III) RECOGNITION OF BRAZILIAN CONFIRMATION ORDER AND RELATED EJ PLAN, AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE AND ADDITIONAL FIRST DAY FILINGS

---

[1] The debtors (the "Debtors") in these chapter 15 cases (the "Chapter 15 Cases"), along with each debtor's tax identification or corporate registry number, are: ODN I Perfurações Ltda. (CNPJ/ME No. 11.165.868/0001-68) ("ODN I Perfurações"), Odebrecht Drilling Norbe VIII/IX Ltd. (No. MC 245888) ("Norbe VIII/IX"), Odebrecht Drilling Norbe Eight GmbH (No. FN 34216i) ("Norbe Eight"), Odebrecht Drilling Norbe Nine GmbH (No. FN 342214g) ("Norbe Nine"), Odebrecht Offshore Drilling Finance Limited (No. MC 277889) ("OODFL"), ODN I GmbH (No. FN 321008x) ("ODN I"), Odebrecht Drilling Norbe Six GmbH (No. FN 347728s) ("Norbe Six"), and ODN Tay IV GmbH (No. FN 353359x) ("Tay IV").

# TABLE OF CONTENTS

PAGE

BACKGROUND ........................................................................................................................4

  A.     General Background ...........................................................................................4

     1.     Overview of the Debtors' Business ............................................................4

     2.     Corporate Structure of the Ocyan Group's Drilling Business ....................6

     3.     Chapter 15 Debtors ...................................................................................7

  B.     The Debtors' Capital Structure .........................................................................9

  C.     The Overseas Debtors' Previous Restructuring ...............................................11

  D.     Events Precipitating Commencement of the Brazilian EJ Proceeding ..........13

  E.     The Brazilian EJ Proceeding and Brazilian Reorganization Plan..................15

     1.     Overview of Restructuring and Brazilian EJ Proceeding .........................15

     2.     The Terms of the Restructuring ...............................................................17

       i.     Transfer of Drilling Business to DrillCo ..............................................18

      ii.     Tranche 2 Notes Exchange and DrillCo Capital Structure .....................18

     iii.    New Money Investment.......................................................................21

     iv.     Tranche 2 Notes Treatment Options .....................................................21

      v.     Election Process and Results ................................................................23

     vi.     Intercompany Debt Treatment .............................................................25

     vii.    Plan Releases ......................................................................................25

  F.     Connections to the United States and this District.........................................26

REQUESTS FOR RECOGNITION AND RELATED RELIEF .................................................27

     1.     Joint Administration Motion....................................................................27

     2.     Scheduling Motion...................................................................................29

     3.     Motion for Recognition............................................................................30

CONCLUSION.............................................................................................................................35

i

I, Rogerio Luis Murat Ibrahim (the "Foreign Representative"), pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

1.      I am over the age of 18 and, if called upon, could testify to all matters set forth in this Declaration (as defined below), except for those portions specified as being otherwise.

2.      I am making this Declaration in accordance with section 1515 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      I am the Chief Financial Officer ("CFO") of Ocyan S.A. (together with its direct and indirect subsidiaries, including the Debtors (as defined below), the "Ocyan Group").  I have also been duly appointed as foreign representative for the Debtors in respect of their *recuperação extrajudicial* proceeding (the "Brazilian EJ Proceeding") in the 4th Business Court of the Judicial District of Rio de Janeiro, Brazil (the "Brazilian Court") pursuant to Federal Law 11,101 of February 9, 2005 (as amended from time to time, the "Brazilian Bankruptcy Law") of the laws of the Federative Republic of Brazil ("Brazil") filed on December 12, 2022 (the "EJ Petition Date"), and I have been duly authorized and empowered by the Debtors to commence these Chapter 15 Cases.

4.      A Brazilian *recuperação extrajudicial*, like a prepackaged case under U.S. Bankruptcy Law, allows for an expeditious and cost-effective reorganization process that will maximize the Debtors' going concern value.  Consummation of the EJ Plan (as defined below) offers the Debtors and their creditors a clear path to revitalized companies, well-positioned to preserve, and build their businesses.  The Debtors have determined that the Chapter 15 Cases are necessary (a) to ensure that creditors cannot attempt to circumvent the Brazilian EJ Proceeding by

taking action against the Debtors in the United States and (b) because consummation of the EJ Plan is conditioned upon entry of an order of the United States Bankruptcy Court for the Southern District of New York (the "Court") recognizing and enforcing the Brazilian EJ Proceeding and the EJ Plan in the territorial jurisdiction of the United States. *See* EJ Plan at § 9.1.2.

5.    I submit this declaration (the "Declaration") in support of the (a) *Official Form 401 Petitions* (collectively, the "Petitions"), (b) *Motion for (I) Recognition of Foreign Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Brazilian Confirmation Order and Related EJ Plan, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Recognition Motion"),[2] (c) *Motion Pursuant to Fed. R. Bankr. P. 2002 and 9007 Requesting Entry of an Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice* (the "Scheduling Motion"), and (d) *Motion for an Order Directing the Joint Administration of ODN I Perfurações Ltda. and Its Debtor Affiliates Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rule 1015(b)* (the "Joint Administration Motion" and, together with the Petitions, Recognition Motion, and the Scheduling Motion, the "First Day Filings"), filed contemporaneously herewith.

6.    I make this declaration on the basis of documentation I have reviewed and facts known to me through my work as the CFO of Ocyan S.A., and in my capacity as foreign representative of the Debtors. Where relevant information has been provided to me by others, the information is true to the best of my knowledge and belief. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[2] Capitalized terms not defined herein have the meanings ascribed to such terms in the Recognition Motion.

## BACKGROUND

**A.**     **General Background**

    *1.*     ***Overview of the Debtors' Business***

7.     The Ocyan Group and its ultimate parent Ocyan S.A. (f/k/a Odebrecht Óleo e Gás S.A.) are privately-held companies that are 100% owned by the Novonor group (f/k/a the Odebrecht Group). The Ocyan Group was originally created to house the Novonor group's oil and gas services activities and has over 45 years of operational experience. The Debtors form part of the Ocyan Group's drilling business (the "Drilling Business"), which provides charter and operation services to its clients that operate in the exploration, development, and production of offshore oil and gas fields in Brazil. In addition to the Drilling Business, the Ocyan Group provides integrated service solutions to the oil and gas industry, including the charter and operation of offshore production units (mainly floating production storage and offloading ("FPSO") units),[3] subsea services, and maintenance activities for the same. Petróleo Brasileiro S.A. ("Petrobras"), Brazil's state-owned oil and gas company, is the main client and business partner of the Drilling Business, and of the Ocyan Group generally. As further detailed below, the EJ Plan restructures only the Ocyan Group's Drilling Business and not other businesses of the Ocyan Group.

8.     Debtors Norbe Six, Norbe Eight, Norbe Nine, and ODN I (collectively, the "Charter Entity Debtors") charter the Ocyan Group's drilling rigs and drillships (collectively, the "Drilling Units"),[4] which operate exclusively in Brazil for primarily Brazilian customers: Petrobras, the

---

[3] FPSOs are vessels used by the offshore oil and gas industry for the production and processing of hydrocarbons, and for the storage of oil. An FPSO vessel is designed to receive hydrocarbons produced by itself or from nearby platforms, process them and store oil until it can be offloaded onto a tanker or transported through pipeline.

[4] As of the date of this Declaration, the Drilling Units consist of five (5) ultra-deepwater drilling rigs and drillships: *Norbe VI Drilling Rig*, *Norbe VIII Drilling Rig*, *Norbe IX Drillship*, *ODN I Drillship*, and *ODN II Drillship*. A drillship is a vessel used in exploratory offshore drilling of new oil and gas wells, and a drilling rig is a large structure with facilities to extract and process oil and gas that lie beneath the seabed.

Libra Consortium, PRIO, and the Consortium BM-BAR-5.[5]  The Drilling Units are currently chartered by these customers under a total of eight (8) charter contracts (the "Drilling Unit Contracts"), each governed by Brazilian law.[6]  As further detailed below, the other Debtors—Norbe VIII/IX, OODFL, Tay IV, and ODN I Perfurações—have no operational activities and instead facilitate the financing of the Ocyan Group's Drilling Business or other tax and corporate organizational purposes.

9.      ODN I Perfurações is organized under the laws of Brazil.  The Charter Entity Debtors and Tay IV (collectively, the "Austrian Debtors") are organized under the laws of Austria. OODFL and Norbe VIII/IX (together, the "Cayman Debtors" and, together with the Austrian Debtors, the "Overseas Debtors") are organized under the laws of the Cayman Islands.  All of the Overseas Debtors (i.e., all of the Debtors except ODN I Perfurações) are issuers or guarantors under the Tranche 2 Notes (as defined below) subject to the restructuring contemplated in the EJ Plan (the "Restructuring").  A simplified corporate structure is provided below in Section A.2.

10.     The Debtors are a part of the Ocyan Group, and as such are operationally and functionally controlled from and centered in Brazil.  As described in further detail below in paragraphs 13–15, each of the Debtors performs specific functions for the Ocyan Group's Drilling Business, but all Debtors are controlled by non-Debtors Ocyan S.A. or Ocyan Drilling S.A. ("Ocyan Drilling" and, together with Ocyan S.A., the "Parent Operating Entities"), both of which are incorporated in and operate from Brazil.  In short, the Debtors own the Drilling Units and

---

[5] (a) The "Libra Consortium" refers to the consortium consisting of Petrobras, as its leader, and Shell plc, Total Energies SE, China National Petroleum Corporation, and China National Offshore Oil Corporation; (b) "PRIO" means Petro Rio S.A. and its subsidiaries and affiliates, which is one of Brazil's largest independent oil and natural gas producers; and (c) the "Consortium BM-BAR-5" refers to the consortium consisting of Petrobras and BP Energy.

[6] The Drilling Unit Contracts are set to expire between May 2023 and March 2027, subject to certain contractual options to extend.

Drilling Unit Contracts, but the non-Debtor Parent Operating Entities actually control and operate the Debtors' business, pursuant to a variety of operating and service agreements with the Debtors.

11.     Key strategic and operating decisions for the Debtors are made by the Chief Executive Officer, myself as CFO, senior management, and the board of directors of Ocyan S.A., who are based in, and work from, offices in the state of Rio de Janeiro, Brazil (the "Rio Offices"). While the Overseas Debtors maintain a presence in their respective jurisdictions of incorporation, given that the Overseas Debtors form part of the greater Ocyan Group (which provides the Debtors with charter and related operational services), the key corporate functions of all Debtors are provided from the Rio Offices through Ocyan S.A. and Ocyan Drilling  These functions include corporate accounting, accounts payable, accounts receivable, financial planning, internal auditing, marketing, treasury, real estate, research and development, tax services, finance, legal, human resources, payroll, billing, freight management, procurement, cash management functions, and engineering services.

### 2.     Corporate Structure of the Ocyan Group's Drilling Business

12.     The Ocyan Group's corporate structure reflects its history of financings, expansions, strategic investments, restructurings, and acquisitions, as well as its corporate strategy of allocating specific operations to different corporate entities.  The chart below shows a simplified corporate structure of the Ocyan Group's Drilling Business:[7]

---

[7] Additional information regarding ownership of stock in the Debtors is set forth in the *Lists Pursuant to Federal Rules of Bankruptcy Procedure 1007(a)(4) and 7007.1 and Local Rule 1007-3* filed contemporaneously herewith.



### 3.    *Chapter 15 Debtors*

13.    <u>Austrian Debtors</u>:  Each of the Austrian Debtors—Norbe Six, Norbe Eight, Norbe Nine, ODN I, and Tay IV—has its registered office in Vienna, Austria and is a guarantor of the Tranche 2 Notes.  Moreover, each of the Austrian Debtors is a wholly-owned indirect subsidiary of Ocyan S.A., and (except for Tay IV)[8] owns and charters the Drilling Units, which all operate in Brazil.  While each of the Austrian Debtors' boards of directors is based in Austria, the principal strategic decisions with respect to them and their Drilling Units' operations are made in Brazil by Ocyan S.A.'s board of directors and the Parent Operating Companies' senior management.  None of the Austrian Debtors have employees; instead, the great majority of employees that work on the Drilling Units are employed by the Parent Operating Companies, which are Brazilian incorporated and controlled entities.  Other than the actions necessary for chartering the Drilling Units in Brazil, none of the Austrian Debtors conduct any business in Austria.

---

[8] Tay IV previously owned and chartered a drilling rig that the Ocyan Group has subsequently sold.

14. <u>Cayman Debtors</u>: Each of the Cayman Debtors—Norbe VIII/IX and OODFL—has its registered office in Grand Cayman, Cayman Islands and is an issuer of the Tranche 2 Notes. Norbe VIII/IX is owned 50% by Norbe Eight and 50% by Norbe Nine and OODFL is owned 24.27% by Norbe Six, 50.18% by ODN I, and 25.55% by Tay IV. The Cayman Debtors are not operational entities, do not engage in autonomous entrepreneurial activities, and were constituted as financing vehicles for the Ocyan Group's Drilling Business, which operates in Brazil. The Cayman Debtors' boards of directors are based in Brazil and principal strategic decisions with respect to them are made by Ocyan S.A.'s board of directors and senior management. Neither Cayman Debtor has any employees.

15. <u>ODN I Perfurações</u>: ODN I Perfurações is an entity organized under the laws of Brazil with its registered office in Rio de Janeiro, Brazil. ODN I Perfurações is a wholly-owned indirect subsidiary of Ocyan S.A. It is not an issuer or guarantor under the Tranche 2 Notes. ODN I Perfurações, as borrower, owes Intercompany Debt (as defined and further detailed in paragraph 45 below) to ODN I, as lender, under an Intercompany Loan Agreement (as defined below), and this Intercompany Debt is being restructured pursuant to the EJ Plan.[9] ODN I Perfurações is not an operational entity; however, its existence stems from the fact that it was originally party to the services agreement relating to the ODN I Drillships, which operate in Brazil. ODN I Perfurações' board of directors is based in Brazil and it has no employees.

---

[9] The Overseas Debtors are also borrowers and lenders under the Intercompany Loan Agreements, as further detailed in paragraph 45 below.

B.      **The Debtors' Capital Structure**

16.     As of the EJ Petition Date, with the exception of the Intercompany Debt, the Overseas Debtors' outstanding funded indebtedness, all of which is issued by the Cayman Debtors and guaranteed by the Austrian Debtors, consisted of approximately:

(a)     $761 million in aggregate principal amount of Tranche 2 7.35% Senior Secured Notes due 2026 (the "2021 Tranche 2 Notes") issued pursuant to that certain indenture dated as of December 22, 2017, by and among Debtor Norbe VIII/IX, as issuer, Debtors Norbe Eight and Norbe Nine, as guarantors (the "2021 Project Notes Guarantors"), the Bank of New York Mellon, as trustee, registrar, transfer agent, and paying agent, and Lord Securities Corporation, as collateral agent (the "2021 Notes Collateral Agent") (the "2021 Indenture"); and

(b)     $1,969 million in aggregate principal amount of Tranche 2 7.72% Senior Secured Notes due 2026 (the "2022 Tranche 2 Notes" and, together with the 2021 Tranche 2 Notes, the "Notes" or the "Tranche 2 Notes" and the holders thereof, the "Noteholders") issued pursuant to that certain indenture dated as of December 22, 2017, by and among Debtor OODFL, as issuer (together with Debtor Norbe VIII/IX, the "Issuers"), Debtors ODN I, Norbe Six, and Tay IV, as guarantors (collectively, the "2022 Project Notes Guarantors" and, together with the 2021 Project Notes Guarantors, the "Guarantors"), HSBC Bank USA, N.A., as trustee, registrar, transfer agent, paying agent, and collateral agent[10] (the "2022 Indenture" and, together with the 2021 Indenture, the "Indentures").

---

[10] In its capacity as the collateral agent under the 2021 Indenture, HSBC Bank USA, N.A. is referred to herein as the "2022 Notes Collateral Agent," and, together with the 2021 Notes Collateral Agent, the "Collateral Agents."

The Tranche 2 Notes are secured by, among other things, a first priority lien on substantially all of the material assets of the Overseas Debtors, including mortgages over all of the Drilling Units, related charters and service contracts and equity interests of the Overseas Debtors, subject to customary exceptions and applicable law (collectively the "Existing Collateral"). As of March 31, 2023, the aggregate amount of principal and interest outstanding under the Indentures was approximately $2.85 billion.

17.     Other funded indebtedness previously outstanding under the Indentures in the aggregate principal amount of approximately $1 billion was paid in full in the ordinary course, prior to the EJ Petition Date.[11]  The Project Notes (as defined below), of which the Tranche 2 Notes are a part, were issued pursuant to the Overseas Debtors' 2017 EJ Plan, as defined and discussed below.

18.     The Indentures include numerous provisions that provide notice to the holders of the Project Notes that restructuring of the Overseas Debtors' obligations could take place in Brazil—as was the case for the 2017 EJ (as defined and discussed below).  For example, the Indentures and the global note for each of the Tranche 2 Notes specifically provide for payment of post-petition interest on the Tranche 2 Notes under Brazilian Bankruptcy Law.[12]  Similarly, the Indentures' waterfall provisions explicitly apply in any proceeding under Brazilian Bankruptcy Law and the events of default under each Indenture include commencement of a voluntary or

---

[11] Specifically, pursuant to the 2021 Indenture, Debtor Norbe VIII/IX issued Tranche 1 Notes in the aggregate principal amount of $500 million (the "2021 Tranche 1 Notes" and, together with the 2021 Tranche 2 Notes, the "2021 Project Notes"), which matured and were repaid in full on September 1, 2021.  Similarly, pursuant to the 2022 Indenture, Debtor OODFL issued Tranche 1 Notes in the aggregate principal amount of $506 million (the "2022 Tranche 1 Notes" and, together with the 2022 Tranche 2 Notes, the "2022 Project Notes" and, together with the 2021 Project Notes, the "Project Notes"), which matured and were repaid in full on December 1, 2022.

[12] 2021 Indenture § 4.01(c), Back of Global Note for 2021 Tranche 2 Notes § (3); 2022 Indenture § 4.01(c), Back of Global Note for 2022 Tranche 2 Notes § (3).

involuntary case against any Overseas Debtor under Brazilian Bankruptcy Law.[13]  In addition, the notice address for the Overseas Debtors that is included in the Indentures and the global note for each of the Tranche 2 Notes is also in Brazil.[14]  The Indentures also make repeated reference to Brazilian rules, regulations, currency, and institutions, including in the definitions of "Business Day," "Cash Equivalents," and "Governmental Authority."[15]  Importantly, the definition of "Bankruptcy Law" in each Indenture includes both the Brazilian Bankruptcy Law and the Bankruptcy Code.[16]

## C.   The Overseas Debtors' Previous Restructuring

19.   On May 23, 2017, the Overseas Debtors, along with certain affiliates that are not presently Debtors under the EJ Plan (together with the Debtors, the "2017 Debtors")[17] jointly filed petitions for commencement of a *recuperação extrajudicial* proceeding (the "2017 EJ") with the Brazilian Court.  Further details regarding the 2017 EJ are set forth in paragraphs 50–52 of the *Declaration of Eduardo Secchi Munhoz in Support of the Motion For (I) Recognition of Foreign Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Brazilian Confirmation Order and Related EJ Plan, and (IV) Related Relief Under Chapter 15 of the Bankruptcy Code and Additional First Day Filings* (the "Foreign Law Declaration").

---

[13] 2021 Indenture § 6.10(c), § 6.01(5)-(6); 2022 Indenture § 6.10(c), § 6.01(5)-(6).

[14] 2021 Indenture, § 13.01; 2022 Indenture, § 13.01.

[15] 2021 Indenture § 1.01; 2022 Indenture § 1.01.

[16] *Id.*

[17] The 2017 Debtors consisted of: Odebrecht Óleo e Gás S.A. (n/k/a Ocyan, S.A.), Odebrecht Oil & Gas GmbH (n/k/a Ocyan Oil & Gas GmbH), Odebrecht Oil Services Ltd. (n/k/a Ocyan Oil Services Ltd.), Odebrecht Oil & Gas Finance Limited, Odebrecht Drilling Norbe VIII/IX Ltd., Odebrecht Drilling Norbe Eight GmbH, Odebrecht Drilling Norbe Nine GmbH, Odebrecht Offshore Drilling Finance Ltd., ODN I GmbH, Odebrecht Drilling Norbe Six GmbH, and ODN Tay IV GmbH.  The 2017 Debtors consisted of the issuers, guarantors and other credit support providers for the notes, and other instruments restructured pursuant to the 2017 EJ Plan.  With the exception of ODN I Perfurações, each of the Debtors in the Brazilian Proceeding and these Chapter 15 Cases was also a 2017 Debtor.

20.     On November 3, 2017, in my capacity as the duly authorized foreign representative of the 2017 Debtors (the "2017 Foreign Representative"), I filed chapter 15 petitions for each of the 2017 Debtors along with supporting pleadings with the Court.[18]  *See In re Odebrecht Óleo e Gás S.A.*, No. 17-13130 (JLG) (Bankr. S.D.N.Y. Nov. 3, 2017) [ECF No. 4].  These filings were not opposed, and the Court entered an order (the "2017 Chapter 15 Order") recognizing and enforcing the 2017 EJ Plan in the territorial jurisdiction of the United States on December 13, 2017.  *See In re Odebrecht Óleo e Gás S.A.*, No. 17-13130 (JLG) (Bankr. S.D.N.Y. Dec. 13, 2017) [ECF No. 28].  In the 2017 Chapter 15 Order, the Court found, among other things, that (a) the 2017 EJ was "a 'foreign proceeding' within the meaning of section 101(23) of the Bankruptcy Code," (b) "Brazil is the center of main interests of the [2017] Debtors, and, accordingly, the Foreign Proceeding is a 'foreign main proceeding' within the meaning of section 1502(4) of the Bankruptcy Code and is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code," and (c) [I was] "the duly appointed 'foreign representative' of each of the [2017] Debtors within the meaning of section 101(24) of the Bankruptcy Code." *See id.*  For ease of reference, the 2017 Chapter 15 Order is attached hereto as Exhibit A.

21.     Shortly after entry of the 2017 Chapter 15 Order, the 2017 EJ Plan went effective under Brazilian Bankruptcy Law on December 21, 2017.  *See In re Odebrecht Óleo e Gás S.A.*,

---

[18] The jointly administered docket can be found at *In re Odebrecht Óleo e Gás S.A.*, No. 17-13130 (JLG) (Bankr. S.D.N.Y. 2017).

No. 17-13130 (JLG) (Bankr. S.D.N.Y. Dec. 13, 2017) [ECF No. 30].  Pursuant to the 2017 EJ

Plan, holders of the 2017 Notes[19] exchanged such notes for the Project Notes.

### D.   Events Precipitating Commencement of the Brazilian EJ Proceeding

22.   The Issuers have made significant progress in repaying the Project Notes since

consummation of the 2017 EJ Plan, including paying the 2021 Tranche 1 Notes and the 2022

Tranche 1 Notes in full.  In addition, the Issuers have paid cash interest on the Project Notes in an

aggregate amount of approximately $347.5 million.  A combination of macroeconomic and

industry-specific factors, however, have necessitated the relief provided under the EJ Plan.

23.   At the outset of the pandemic, the Debtors grappled with cratering oil-and-gas

prices.  The eventual, albeit slow, rebound in oil and gas prices was helpful, but the Debtors' ability

to benefit from it was limited by its existing contract terms and (as detailed below) the substantial

investment that winning new contracts requires.  In addition, prices have spiked for a wide array

of goods used in, and services necessary for, the Drilling Business, such as logistics, labor, third-

party contractors, enhanced healthcare, and other goods and services.

24.   In the offshore oil and gas markets in which the Debtors operate, drilling rigs and

drillships are also in oversupply.  Many competing drilling rigs and drillships have been able to

undercut Ocyan S.A.'s pricing in winning new drilling contracts for the Debtors because these

drilling rigs and drillships are owned and operated by competitors with already-optimized capital

---

[19] As further detailed in the *Declaration of Rogerio Luis Murat Ibrahim*, the "2017 Notes" means those certain previously outstanding (a) 6.35% Senior Secured Notes due 2021 issued by Norbe VIII/IX and guaranteed by Norbe Eight and Norbe Nine; (b) 6.75% Senior Secured Notes due 2022 issued by OODFL and guaranteed by ODN I and Norbe Six; and (c) 6.625% Senior Secured Notes due 2022 issued by OODFL and guaranteed by ODN I, Norbe Six, and Tay IV.  *See Odebrecht Óleo e Gás S.A.*, No. 17-13130 (JLG) (Bankr. S.D.N.Y. Nov. 3, 2017) [ECF No. 5]. While other financial instruments were restructured pursuant to the 2017 EJ Plan, the Project Notes were not consideration for those instruments.  *Id.*

structures.  Therefore, somewhat ironically, the Debtors' overleveraged balance sheet has been, in part, to blame for their inability to de-lever by winning a sufficient number of new contracts.

25.     Relatedly, in order to win the drilling contracts that Ocyan S.A. has successfully obtained for the Debtors, it was necessary for the Debtors to invest increasing amounts of capital ("CapEx") in their assets.  Similarly, in their drive to maintain operational excellence and expand the array of services offered to their customers, the Debtors' operational expenses ("OpEx") have also increased.  These elevated CapEx and OpEx requirements, which were exacerbated by recent inflationary pressures and oil price fluctuations, combined with lower daily market charter rates and the lack of charter performance bonuses, have further limited the Debtors' ability to allocate capital to repay debt.  Notwithstanding, the Debtors are pleased to report that the Ocyan Group's Drilling Business has recently won three (3) new drilling contracts (the "New Drilling Contracts"); however, commencement of the New Drilling Contracts is contingent upon consummation of the Restructuring, which will provide the funds necessary to maintain and modify the Drilling Units to fulfill the Ocyan Group's obligations under the New Drilling Contracts.

26.     In response to these headwinds, since the first quarter of 2021, the Debtors, with the assistance of their advisors, Davis Polk & Wardwell LLP ("Davis Polk"), as counsel under New York law, E. Munhoz Advogados ("E. Munhoz" or "Brazilian Counsel"), as counsel under the laws of Brazil, and Lazard Assessoria Financeira Ltda., as financial advisor, have taken steps to negotiate a restructuring of their liabilities with an ad hoc group of Noteholders holding a majority of the Tranche 2 Notes (the "Ad Hoc Group").  Those negotiations ultimately led to the broadly supported Restructuring, as further described below.

E.    **The Brazilian EJ Proceeding and Brazilian Reorganization Plan**

  *1.    Overview of Restructuring and Brazilian EJ Proceeding*

27.    The commencement of the Brazilian EJ Proceeding was duly authorized in accordance with the Debtors' constitutional documents and applicable corporate laws[20] and on the EJ Petition Date of December 12, 2022, the Debtors submitted their extrajudicial restructuring plan (as supplemented, amended, or otherwise modified and including the exhibits attached thereto, the "EJ Plan") to the Brazilian Court, copies of which (in both Portuguese and English) are attached hereto as Exhibit B.  The EJ Plan was filed with the support of holders of approximately 71% of the 2021 Tranche 2 Notes and approximately 57% of the 2022 Tranche 2 Notes.

28.    On the EJ Petition Date, the Debtors issued a press release announcing the commencement of the Brazilian EJ Proceeding (the "EJ Press Release"), a copy of which was posted on the company's website later that same day at https://www.ocyan-sa.com/en/press/notice-to-market   (the   "Company   Website")   and   on   the   Debtors'   case   website   at https://dm.epiq11.com/case/ocyan/info (the "Case Website"), to provide further public notice of the filing.  A copy of the EJ Press Release is attached hereto as Exhibit C.

29.    On December 15, 2022, the Brazilian Court entered an interlocutory order that, among other things, confirmed acceptance of the filing of the Brazilian EJ Proceeding, ratified the preliminary automatic one-hundred eighty (180)-day stay of all actions and enforcement proceedings commenced against the Debtors by creditors subject to the Brazilian EJ Proceeding (including holders of the Tranche 2 Notes), and ordered the publication of a public notice informing affected creditors of the filing of the Brazilian EJ Proceeding (the "Initial Court Order").

---

[20] I am so informed by my counsel in the jurisdiction of organization of each of the Debtors.  E. Munhoz, Maples and Calder (Cayman) LLP and DORDA Rechtsanwälte GmbH (collectively, "Non-U.S. Counsel") serve as counsel to the Foreign Representative in Brazil, the Cayman Islands, and Austria, respectively.

Foreign Law Decl. ¶ 54.  A copy of the Initial Court Order and a certified English translation thereof are attached hereto as <u>Exhibit D</u>.

30.     On January 9, 2023, the Brazilian Court published the public notice (*edital*) (the "<u>Public Notice</u>") of the Brazilian EJ Proceeding to affected creditors in the Brazilian Court's official judicial gazette.  Foreign Law Decl. ¶ 56.  A copy of the Public Notice and a certified English translation thereof are attached hereto as <u>Exhibit E</u>.  The publication of the Public Notice began the EJ Plan's thirty (30)-day objection period, setting the objection deadline for February 8, 2023 (the "<u>Objection Deadline</u>").  *Id.*

31.     On January 11, 2023, the Debtors sent a notice of the filing of the Brazilian EJ proceeding and terms of the EJ Plan, as required pursuant to Brazilian Bankruptcy Law (the "<u>Brazilian Law Notice</u>"), to (a) the Intercompany Creditors (as defined below), (b) The Bank of New York Mellon, as trustee under the 2021 Indenture (in such capacity, the "<u>2021 Notes Trustee</u>"), and  (c) HSBC Bank USA, N.A., as trustee under the 2022 Indenture (the "<u>2022 Notes Trustee</u>" and, together with the 2021 Notes Trustee, the "<u>Trustees</u>") for distribution to the Noteholders.  A copy of the Brazilian Law Notice is attached hereto as <u>Exhibit F</u>.[21]

32.     As stated in the Foreign Law Declaration filed contemporaneously herewith, the Objection Deadline passed on February 8, 2023, with no objections to the EJ Plan filed.  Foreign Law Decl. ¶ 58.  In light of the absence of objections and broad support for the EJ Plan, the Brazilian Court entered an order (the "<u>Brazilian Confirmation Order</u>") confirming the EJ Plan on March 20, 2023.  *Id.*  The Brazilian Confirmation Order and a certified English translation thereof

---

[21] In accordance with Section 11.1.11 of the EJ Plan, on or before the effective date of the Restructuring (the "<u>Closing Date</u>"), the Debtors, the Trustees, and the other Existing Agents (as defined below) will enter into an indemnification agreement (the "<u>Existing Agents Supplemental Indemnification</u>") providing for the survival of the Existing Agents' claims for indemnification and payment of fees and expenses in connection with the Indentures, in each case, subject to and in accordance with the terms thereof.

are attached hereto as <u>Exhibit G</u>.  As further detailed in the Foreign Law Declaration, the deadline

to appeal the Brazilian Confirmation Order or seek a stay of its effects expires fifteen (15) business

days after notice of the entry of the Brazilian Confirmation Order is published in the Brazilian

Court's judicial gazette, which occurred on March 29, 2023.  *Id.* at ¶ 59.  Accordingly, the deadline

to appeal the Brazilian Confirmation Order is April 24, 2023.  *Id.*  As of the date hereof, no motion

has been filed seeking to appeal the Brazilian Confirmation Order or stay its effects.  *Id.*  I am

informed by E. Munhoz that, given the broad support for the EJ Plan and absence of objections, it

is unlikely that a party-in-interest would seek to appeal the Brazilian Confirmation Order or stay

its effects.  *Id.*  In the unlikely event that such a motion is filed, Brazilian Counsel will promptly

file a supplemental declaration informing this Court.

33.     On April 5, 2023, the boards of directors of each of the Overseas Debtors, and the

shareholders of ODN I Perfurações, duly adopted resolutions appointing me to act as foreign

representative in these Chapter 15 Cases (collectively, the "<u>Chapter 15 Authorizing Resolutions</u>")

and each of the Debtors granted me power of attorney to commence and prosecute these Chapter

15 Cases.  I am informed by my Non-U.S. Counsel that each appointment complied with the

constitutional documents and applicable corporate laws of the applicable Debtor.  Copies of the

Chapter 15 Authorizing Resolutions, as well as the powers of attorney granted to me by the

Debtors, are attached hereto as <u>Exhibit H</u>.

## 2.     *The Terms of the Restructuring*

34.     The Restructuring is effectuated through the transfer of the Drilling Business to a

new holding company ("<u>DrillCo</u>") domiciled in the Grand Duchy of Luxembourg ("<u>Luxembourg</u>")

that will hold the Drilling Business going forward. On the Closing Date, DrillCo will issue new

securities to Tranche 2 Noteholders, in exchange for their Tranche 2 Notes, as well as in exchange

for the New Money Investment (as defined below) to fund the company going forward.

Participation in the New Money Investment was open to all Noteholders on a ratable basis. The key terms of the Restructuring are described in further detail in the following paragraphs, and a simplified post-Restructuring corporate structure with pro-forma equity holdings is attached hereto as Exhibit I.

### i.   Transfer of Drilling Business to DrillCo

35.   As further detailed in that certain Drilling Business Transfer Agreement attached as Schedule 5.1 to the EJ Plan (the "DBTA"), pursuant to the EJ Plan, the Ocyan Group (including the Debtors and certain non-Debtor members of the Ocyan Group) will (with certain exceptions) transfer all of their respective drilling assets, people, infrastructure, and contracts used in the Drilling Business and associated obligations and liabilities to DrillCo.[22]  This will occur principally through (a) the contribution of certain drilling assets currently held by Ocyan S.A. to Ocyan Drilling, (b) the contribution of Ocyan Drilling to AIAS (as defined below), the current direct or indirect parent of the Debtors, and (c) the contribution of AIAS to DrillCo.

### ii.   Tranche 2 Notes Exchange and DrillCo Capital Structure

36.   Upon consummation of the EJ Plan, DrillCo will issue the Plan Consideration (as defined below) elected by each Noteholder to that Noteholder in exchange for its Tranche 2 Notes, and accordingly will subrogate into and become the owner of the Tranche 2 Notes pursuant to applicable law, at which time the Tranche 2 Notes will become an intercompany claim held by DrillCo against the Debtors (the "Tranche 2 Intercompany Claim").  DrillCo will be empowered to transfer the Tranche 2 Intercompany Claim to its wholly-owned subsidiary AIAS, which will be a guarantor of the New Notes (as defined below) and empowered, in turn, to transfer, liquidate,

---

[22] For the avoidance of doubt, upon the Closing Date and as contemplated in Section 2.6(iii) of the DBTA, other than CAPEX and OPEX (each as defined in the DBTA), intercompany obligations between Ocyan S.A. and its current subsidiaries will be retained by Ocyan S.A.

restructure, or perform any other transaction with such Tranche 2 Intercompany Claim in its discretion, in each case, as the Debtors find most effective and efficient under applicable law, including tax and regulatory requirements, as provided in Section 5.4 of the EJ Plan.   No obligations to third parties under the Tranche 2 Notes or the Indentures will survive consummation of the EJ Plan, other than the claims of the Existing Agents for indemnification and payment of fees and expenses, in each case, as set forth in, and subject to, the terms of the Existing Agents Supplemental Indemnification.   The Existing Collateral will be released, and substantially all of the Existing Collateral (and the further collateral as described in paragraph 38 below) will secure the New Notes. The Tranche 2 Intercompany Claim will be unsecured.

37.     The equity in DrillCo ("DrillCo Equity") will consist of three classes: (a) "Class A Shares," which will be distributed to Ocyan Oil & Gas GmbH ("Ocyan GmbH"), an Ocyan S.A. subsidiary, (b) "Class B Voting Shares," which will be distributed to Noteholders and, subject to certain conditions, to existing management of Ocyan S.A. (pursuant to DrillCo's management incentive plan), and (c) "Class C Nonvoting Shares," which will be distributed to Noteholders, Ocyan GmbH, and existing management of Ocyan S.A. (pursuant to DrillCo's management incentive plan).   The Class A Shares and Class B Voting Shares will constitute 6.5% and 93.5% of the voting rights in DrillCo, respectively.   The Class C Nonvoting Shares will be the only nonvoting equity securities issued by DrillCo pursuant to the EJ Plan.   The Class A Shares and the Class B Voting Shares will, together, constitute 10% of DrillCo's total equity capital, whereas, the Class C Nonvoting Shares will constitute the remaining 90%.

38.     At consummation of the EJ Plan, DrillCo will also issue approximately $300 million of new secured notes (the "New Notes").   The New Notes will mature seven years after their issue date and will bear interest at 7.5% per annum, payable quarterly in cash.   With the

exception of ODN I Perfurações, each of the Debtors and certain other non-Debtor Ocyan S.A. subsidiaries will guarantee the New Notes (collectively, the "New Notes Guarantors").[23]  The New Notes will be secured by, among other things, a first priority lien on substantially all of the material assets of DrillCo, the New Notes Guarantors, and certain of their subsidiaries (collectively, the "Collateral").  The Collateral includes mortgages over all of the drilling rigs and drillships, related charters and service contracts, and equity interests of DrillCo, the New Notes Guarantors, and Ocyan Drilling, subject to customary exceptions, applicable law, and the New Notes Term Sheet attached to the EJ Plan as Schedule 4.2 (the "New Notes Term Sheet").  The New Notes are expected to be listed on an international securities exchange within six (6) months of their issue date.  The terms and conditions of the New Notes shall be set forth in an indenture (the "New Notes Indenture") governed by New York law, which shall reflect, in all material respects, the terms and conditions of the New Notes Term Sheet.

39.    As described below, Noteholders were also able to elect (the "ConvertCo Election") to receive unsecured convertible notes (the "ConvertCo Notes") issued by a new Luxembourg-domiciled company ("ConvertCo") in lieu of Class C Nonvoting Shares.  The ConvertCo Notes shall be exchangeable for a certain amount of Class C Nonvoting Shares at the holder's election or automatically upon the occurrence of certain mandatory exchange events.  The ConvertCo Notes will mature twenty (20) years after their issue date and will bear interest at 0.5% per annum, payable semiannually in cash or in kind.  The terms and conditions of the ConvertCo Notes shall be set forth in an indenture (the "ConvertCo Indenture") governed by New York law, which shall

---

[23] The non-Debtor guarantors of the New Notes include (a) Austrian limited liability companies AIAS GmbH ("AIAS"), ODN Holding GmbH, and ODN Tay IV Holding GmbH, (b) Cayman Islands exempted company Ocyan Drilling Services Limited, and (c) United Kingdom private limited company Ocyan Drilling United Kingdom Limited.

reflect, in all material respects, the terms and conditions of the Exchangeable Notes Term Sheet attached to the EJ Plan as Schedule 4.4.

### iii. New Money Investment

40.     All Noteholders had the option to provide DrillCo with a new money investment (the "New Money Investment") in the aggregate amount of approximately $197 million in exchange for (a) New Notes and (b)(i) Class B Voting Shares and Class C Nonvoting Shares or (ii) Class B Voting Shares and ConvertCo Notes.  Noteholders were allowed to fund their New Money Investment by waiving their right to receive pro rata cash payments (the "Deferred Cash")[24] that would otherwise be payable to them as Plan Consideration.  Pursuant to that certain Backstop Commitment Agreement (as amended, restated, supplemented, or otherwise modified, the "BCA"), the members of the Ad Hoc Group committed to fund any portion of the New Money Investment not elected by other Noteholders (the "Backstop Investment").

### iv. Tranche 2 Notes Treatment Options

41.     Under the EJ Plan, each Noteholder was able to elect to exchange its Tranche 2 Notes for one of five combinations ("Options")[25] of consideration (the "Plan Consideration"):

---

[24] The Deferred Cash consists of two silos: (a) cash proceeds from those certain debt service reserve accounts (the "DSRAs") securing the Tranche 2 Notes (the "DSRA Deferred Cash"), which is paid as Plan Consideration irrespective of a Noteholder's Election, and (b) cash interest on the Tranche 2 Notes that accrued from (i) June 1, 2022 (the last date on which interest was paid in cash under the Tranche 2 Notes) to the calendar day immediately preceding the EJ Petition Date (the "Pre-Filing Interest Cash") and (ii) the EJ Petition Date until the closing of the Restructuring (the "Post-Filing Interest Cash").  The Post-Filing Interest Cash is paid only to Noteholders that elect either Option A-1 or Option A-2 (as summarized below).  The amount of DSRA Deferred Cash and Pre-Filing Interest Cash available to fund the New Money Investment is approximately $197 million and $39 million, respectively. The amount of Post-Filing Interest Cash available to fund the New Money Investment will depend on the Closing Date, but the EJ Plan provides that the Pre-Filing Interest Cash plus the Post-Filing Interest Cash is subject to an aggregate cap of $51 million.

[25] I am advised by E. Munhoz, counsel under Brazilian law, that providing creditors with optionality regarding their plan consideration is common in Brazilian *recuperação extrajudicial* plans.  Here, the necessity for the various election options arose due to, among other things, the existence of Brazilian case law providing that *recuperação extrajudicial* plans must provide an alternative payment option for those creditors that do not want to hold equity. Foreign Law Decl. ¶ 56, n.16.

| Election Option | Plan Consideration | New Money Investment Consideration |
|---|---|---|
| Option A-1 | • (a) New Notes,<br>• (b) DrillCo Equity in the form of Class B Voting Shares and Class C Nonvoting Shares, and<br>• (c) any Deferred Cash remaining after funding such Noteholder's New Money Investment | • (a) New Notes and<br>• (b) DrillCo Equity in the form of Class B Voting Shares and Class C Nonvoting Shares |
| Option A-2 | • (a) New Notes,<br>• (b) Class B Voting Shares,<br>• (c) ConvertCo Notes, and<br>• (d) any Deferred Cash remaining after funding such Noteholder's New Money Investment | • (a) New Notes,<br>• (b) Class B Voting Shares, and<br>• (c) ConvertCo Notes |
| Option B-1 (default Option) | • (a) DSRA Deferred Cash,<br>• (b) New Notes, and<br>• (c) DrillCo Equity in the form of Class B Voting Shares and Class C Nonvoting Shares | N/A |
| Option B-2 | • (a) Cash,<br>• (b) New Notes,<br>• (c) Class B Voting Shares, and<br>• (d) ConvertCo Notes | N/A |
| Option C | • (a) DSRA Deferred Cash and<br>• (b) New Notes | N/A |

Option B-1 was deemed elected as the default by any Noteholder that failed to elect a different Option. Each Option is comprised of varying combinations of: (a) cash, (b) DrillCo Equity, (c) New Notes, and (d) ConvertCo Notes. Paragraphs 37–39 of this Declaration, above, provide further details regarding each category of Plan Consideration.

### v.      *Election Process and Results*

42.      On January 9, 2023, the Debtors launched an election process (the "Election")

through The Depository Trust Company's ("DTC") automated-tender option program ("ATOP"),

giving Noteholders the opportunity to elect to fund the New Money Investment and elect the type

of consideration they would like to receive under the EJ Plan.  Participation in each of the Election

and the New Money Investment was open to all Noteholders on a ratable basis.  Annex A to the

Election Notice (as defined below) summarized the five Options for packages of Plan

Consideration available to each Noteholder, including the amount of New Notes, DrillCo Equity,

and cash that would be available (on a pro rata basis) to such Noteholder depending on (a) the

amount of such Noteholder's 2021 Tranche 2 Notes or 2022 Tranche 2 Notes and (b) such

Noteholder's Election.

43.      On that same day, the Debtors issued a press release announcing the launch of the

Election on the Company Website (the "Election Launch Press Release") and posted notice of the

Election (the "Election Notice") and an Election form (the "Election Form") on the Case Website.

In addition, Epiq Corporate Restructuring, LLC, in its capacity as the Debtors' information agent

(the "Information Agent") sent the Election Notice and Election Form to the Noteholders through

the banks and brokerage firms holding Tranche 2 Notes through DTC or such firm's nominee

representative, with sufficient copies and instructions to forward such documents to the

Noteholders.  Copies of the Election Notice, the Election Form, and the Election Launch Press

Release are attached hereto as Exhibit J, Exhibit K, and Exhibit L, respectively.  As stated in the

Election Notice and Election Form, the deadline to make an Election expired on February 8, 2023

(the "Election Deadline"). As of the Election Deadline, the results of the Election were as follows: [26]

| Election Option | 2021 Tranche 2 Notes | | 2022 Tranche 2 Notes | |
| | Principal Tendered | Tendered Percentage of 2021 Tranche 2 Notes Outstanding | Principal Tendered | Tendered Percentage of 2022 Tranche 2 Notes Outstanding |
| --- | --- | --- | --- | --- |
| Option A-1 Election | $416,650,479 | 53.75% | $1,040,447,020 | 51.84% |
| Option A-2 Election | $312,974,344 | 40.38% | $794,330,625 | 39.57% |
| Option B-1 Election (DEFAULT) | $8,778,690 | 1.13% | $20,144,148 | 1.00% |
| Option B-2 Election | $3,280,019 | 0.42% | $5,560,879 | 0.28% |
| Option C Election | $6,823,975 | 0.88% | $33,212,940 | 1.65% |
| Totals | **$748,507,507** | **96.57%** | **$1,893,695,612** | **94.35%** |

44.    As depicted in the chart above, both the Election and the New Money Investment enjoyed a high level of Noteholder participation.  Because Noteholders representing less than 100% of the aggregate principal amount outstanding under the Tranche 2 Notes made the Option A-1 or Option A-2 election, the Backstop Parties will fund the Backstop Investment, pursuant and subject to the terms of the BCA.  As of March 31, 2023, the total amount of the Backstop Investment is approximately $14.5 million.[27]  As stated in the Election Notice and the Election

---

[26] As stated in the Election Notice and Election Form, the Noteholders have the right to withdraw their Tranche 2 Notes from the Election following the Election Deadline and up to 20 business days prior to the anticipated Closing Date (the "Withdrawal Deadline"), which is set to occur later this month.  Any Noteholder that withdraws Tranche 2 Notes shall, with respect to such Tranche 2 Notes, be deemed to have selected Option B-1 (the default Option). Accordingly, until the Withdrawal Deadline occurs, the results of the Election are subject to change.  As of April 9, 2023, no Noteholder has withdrawn their Tranche 2 Notes, and the results of the Election remain the same as they were at the Election Deadline.

[27] On March 29, 2023, the Debtors, through the Information Agent, published on the Case Website and sent to Noteholders that elected Option A-1, Option A-2, Option B-1, or Option B-2 in the Election a notice (the "CADE Notice") regarding certain potential antitrust filing and disclosure obligations under Brazilian antitrust law.  As further detailed in the CADE Notice, Noteholders that anticipate receiving 5% or more of the DrillCo Equity may have certain filing and disclosure obligations to Brazil's antitrust and competition authority, *Conselho Administrativo de Defesa Econômica* (CADE).

Form, any Noteholder that failed to timely make an Election by the Election Deadline was deemed to have selected Option B-1.

### vi.   *Intercompany Debt Treatment*

45.     Certain intercompany claims (the "Intercompany Debt") between and among the Debtors arose prior to the EJ Petition Date pursuant to certain credit agreements (the "Intercompany Loan Agreements") executed in the ordinary course of business by and among certain of the Debtors as borrowers (the "Intercompany Debtors") and certain of the Debtors as lenders (in such capacities, the "Intercompany Creditors").  After the Closing Date, the Debtors are authorized to seek repayment or release of the Intercompany Debt, in each case, as the Debtors find most effective and efficient under applicable law, including tax and regulatory requirements. The payment of the Intercompany Debt shall be subordinated to the payment of all other claims subject to the Restructuring and the New Notes pursuant to section 3.5 of the EJ Plan.  The amount of Intercompany Debt owed by each Debtor as of the day before the EJ Petition Date is stated on Schedule L to the EJ Plan; however, a simplified chart thereof is as follows:

| Intercompany Debt | | | |
|---|---|---|---|
| **Intercompany Debtors** | **Intercompany Creditors** | | |
| | **ODN I** | **Norbe VIII/IX** | **OODFL** | **Norbe Eight** |
| **Norbe Six** | $160.7 million | - | $675.2 million | - |
| **Norbe Eight** | - | $387.2 million | - | - |
| **Norbe Nine** | - | $387.9 million | - | $19.8 million |
| **ODN I** | - | - | $1.3 billion | - |
| **ODN I Perfurações** | $188.3 thousand | - | - | - |

### vii.   *Plan Releases*

46.     The EJ Plan provides for certain customary releases.  At a high level and as further detailed in paragraphs 25–30 of the Foreign Law Declaration, the releases in the EJ Plan fall into the following three categories: (a) the Existing Agent Release (as defined in the Foreign Law

Declaration) in favor of the Trustees and other Existing Agents [28] for acts or omissions in connection with any Noteholder instructions, claims related to the Tranche 2 Notes, and any acts or omissions related to the Restructuring, (b) the DrillCo Consummation Release (as defined in the Foreign Law Declaration) in favor of the Ocyan Group, the Existing Agents, the Noteholders, and other Signatory Creditors (as defined in the Foreign Law Declaration), for claims related to the issuance or delivery of the New Notes, capitalization, and delivery of the DrillCo Equity to the Noteholders, and acts taken to effect the foregoing, and (c) the ConvertCo Consummation Release (as defined in the Foreign Law Declaration and, together with the Existing Agent Release and the DrillCo Consummation Release, the "Releases") in favor of the Debtors and their affiliates from claims related to issuance of the ConvertCo Notes or the acts taken to do so.  Foreign Law Decl. ¶¶ 25–30.

## F.      Connections to the United States and this District

47.      The Debtors have property in the United States, including in this jurisdiction.  Each of the Debtors has an interest in cash paid by ODN I to Davis Polk for the benefit of each Debtor as retainer for Davis Polk's services in connection with the Brazilian EJ Proceeding and the Chapter 15 Cases, in a bank account located in Manhattan, New York (the "U.S. Bank Account").  Additionally, the Indentures are governed by New York law and contain provisions submitting the Debtors to the jurisdiction of any New York state or United States federal court sitting in the

---

[28] "Existing Agents" means, collectively, (a) the 2021 Notes Trustee, in its capacity as trustee, registrar, transfer agent, and paying agent under the 2021 Indenture and the offshore accounts bank (the "2021 Offshore Account Bank") with respect to the 2021 Indenture, (b) TMF (Cayman) Ltd., TMF Austria GmbH, TMF Trustee Limited, and the 2021 Notes Collateral Agent as collateral agents in connection with the 2021 Tranche 2 Notes, (c) the 2022 Notes Trustee in its capacity as trustee, registrar, transfer agent, paying agent, and collateral agent under the 2022 Indenture and acting in any other capacity or role under or in connection with the 2022 Tranche 2 Notes, and HSBC Bank Plc, acting in its capacity as offshore accounts bank pursuant to the applicable accounts agreement under the 2022 Tranche 2 Notes, including any successor offshore accounts bank appointed pursuant to the applicable accounts agreements under the 2022 Tranche 2 Notes (the "2022 Offshore Account Bank" and, together with the 2021 Offshore Account Bank, the "Offshore Account Banks").

Borough of Manhattan in the City of New York.  Upon information and belief, certain holders of the Tranche 2 Notes have headquarters or significant operations in the borough of Manhattan.

## REQUESTS FOR RECOGNITION AND RELATED RELIEF

48.     In connection with filing of the Chapter 15 Cases, by and through my counsel, I have submitted the First Day Filings.  In addition to the facts set forth above, factual bases for relief under these motions is set forth below.  I believe, after consultation with counsel, that the relief requested by each of the First Day Filings is necessary to maximize value for all of the Debtors' creditors through the Brazilian EJ Proceeding and to properly administer the Chapter 15 Cases.

### 1.     *Joint Administration Motion*

49.     Concurrently herewith, by and through my counsel, I have filed the Joint Administration Motion seeking entry of an order directing joint administration of the Chapter 15 Cases for procedural purposes only, and providing that parties-in-interest shall use a consolidated caption to indicate that any pleading filed relates to the jointly administered Chapter 15 Cases.

50.     I believe that joint administration of the Chapter 15 Cases is warranted because the Debtors' financial affairs and business operations are closely related and because it will ease the administrative burden of the Chapter 15 Cases on the Court and interested parties and minimize confusion for affected creditors.  I can confirm that the various notices, motions, orders, and other pleadings in the Chapter 15 Cases will affect all of the Debtors.  I believe that the failure to jointly administer the Chapter 15 Cases would result in numerous duplicative pleadings filed for each issue and served upon separate service lists for eight affiliated Debtors.  I also believe that such duplication of substantially identical documents would be wasteful and would unnecessarily burden the Clerk of the Court (the "Clerk").

51.     Moreover, I have been advised that joint administration will permit the Clerk to use a single docket for all of the Debtors' cases and to combine notices to creditors and other parties-in-interest, which will be both efficient and economic by reducing the overall costs of service. I have further been advised that joint administration will protect parties-in-interest by ensuring that they will be apprised of the various matters before the Court and minimize confusion from multiple notices that appear duplicative. I believe that the proposed caption set forth in the Joint Administration Motion should be approved as the modified caption for the Chapter 15 Cases.

52.     I believe that the rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of the Chapter 15 Cases inasmuch as the relief sought in the Joint Administration Motion is purely procedural and not intended to affect substantive rights. I have been advised that each creditor and party-in-interest will maintain whatever rights it has against the particular Debtor against which it allegedly has a claim or right. I have also been told by my counsel that the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration. I have also been informed by my counsel that all creditors are likely to benefit from the Chapter 15 Cases being jointly administered because there would be reduced costs associated with the resulting streamlined services of process. Finally, I have been advised that if the requested relief is granted, the Court and the Clerk will be relieved of the burden of entering duplicative orders and keeping duplicative files, and supervision of the administrative aspects of the Chapter 15 Cases by the Office of the United States Trustee for Region 2 will be simplified. Therefore, I believe that the relief requested in the Joint Administration Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties-in-interest.

### 2. *Scheduling Motion*

53.     Concurrently herewith, by and through my counsel, I have also filed the Scheduling Motion seeking the entry of an order approving, among other things, (a) the form and manner of service of notice (the "Recognition Hearing Notice") of (i) the filing of the Debtors' Petitions and certain related pleadings, including the Recognition Motion, (ii) the deadline to object to the Court's entry of a final order (the "Proposed Recognition Order") granting the final relief sought in the Recognition Motion (the "Objection Deadline"), and (iii) the hearing for the Court to consider the Petitions and the relief requested in the Recognition Motion (the "Recognition Hearing"), (b) the form and manner of service of the Recognition Hearing Notice on any party that files a notice of appearance in the Chapter 15 Cases, (c) the form and manner of service on the master service list of any pleadings or papers that I file through my counsel in the Chapter 15 Cases, and (d) granting certain related relief.

54.     I can attest that the Debtors have many creditors and other parties-in-interest that received actual notice or notice by publication of the Brazilian EJ Proceeding and many of whom may need to be provided with notice of the Proposed Recognition Order, the Objection Deadline, the Recognition Hearing, or other papers filed in the Chapter 15 Cases.  Under the facts and circumstances of the Chapter 15 Cases, I submit that service of the Recognition Hearing Notice, and service of other papers in the manner proposed in the Scheduling Motion will provide parties-in-interest due and sufficient notice of the relief requested in the Recognition Motion, the associated objection deadline, hearing dates, and of any other papers that may be filed in the Chapter 15 Cases.

55.     Furthermore, I believe that the Recognition Hearing Notice provides multiple efficient ways for any party receiving such notice to obtain copies of pleadings filed in the Chapter 15 Cases, as it provides website addresses that can be used to obtain critical documents including

the Recognition Motion and the Proposed Recognition Order. Additionally, I believe that service

by the Debtors of all pleadings that they file in the Chapter 15 Cases by electronic mail to the

extent email addresses are available, and otherwise by overnight mail or United States mail, first-

class postage prepaid on the Notice Parties (as defined in the Scheduling Motion) is an efficient

and effective way to provide notice to such key parties in the Chapter 15 Cases. I also believe that

such proposed procedures will not overburden the Debtors with the significant costs associated

with copying and mailing all the various documents filed in the Chapter 15 Cases to the entire

matrix of putative creditors and other parties.

56.     Therefore, I believe that the relief requested in the Scheduling Motion is necessary

and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other

parties-in-interest.

### 3.     *Motion for Recognition*

57.     Concurrently herewith, by and through my counsel, I have filed the Recognition

Motion seeking entry of an order, among other things:

> (a) granting the Recognition Motion and recognizing the Brazilian EJ Proceeding
> as a "foreign main proceeding" (as defined in section 1502(4) of the Bankruptcy
> Code) of the Debtors pursuant to section 1517 of the Bankruptcy Code, all relief
> included therewith as provided in section 1520 of the Bankruptcy Code, and
> related relief under section 1521(a);[29]

> (b) finding that the Foreign Representative is the duly appointed "foreign
> representative" of the Debtors within the meaning of section 101(24) of the
> Bankruptcy Code and that the Foreign Representative is authorized to act on
> behalf of the Debtors for purposes of the Chapter 15 Cases;

---

[29] Alternatively, should the Court decline to recognize the Brazilian EJ Proceeding as the foreign main proceeding for
any of the Debtors, the Foreign Representative respectfully requests that the Court recognize such proceeding as a
"foreign nonmain proceeding" (as defined in section 1502(5) of the Bankruptcy Code), and grant appropriate relief to
the same extent such relief would be granted pursuant to section 1520(a) of the Bankruptcy Code had the proceeding
been recognized as a foreign main proceeding.

(c) entrusting the Foreign Representative with the power to administer, realize, and distribute all assets of the Debtors within the territorial jurisdiction of the United States;

(d) recognizing and enforcing the EJ Plan (as defined below) in the United States and giving full force and effect, and granting comity in the United States, to the Brazilian Confirmation Order, including, without limitation, giving effect to the Releases set forth in the EJ Plan and to allow the Foreign Representative, the Debtors, and their respective expressly authorized representatives and agents to take actions necessary to consummate the EJ Plan and transactions contemplated thereby;

(e) permanently enjoining all entities (as that term is defined in section 101(15) of the Bankruptcy Code) other than the Foreign Representative, the Debtors, and their respective expressly authorized representatives and agents from (i) commencing, continuing, or taking any action in the United States that contravenes or would interfere with or impede the administration, implementation, and/or consummation of the Brazilian EJ Proceeding, EJ Plan, or Brazilian Confirmation Order including, without limitation, to obtain possession of, exercise control over, or assert claims against the Debtors or their property or (ii) taking any action against the Debtors or their respective property located in the territorial jurisdiction of the United States to recover or offset any debt or claims that are assigned, subrogated, discharged, extinguished, novated, canceled, or released under the EJ Plan (including as a result of the laws of Brazil or other applicable jurisdiction, as contemplated under the EJ Plan) or the Brazilian Confirmation Order;

(f) authorizing and directing the Directed Parties[30] and any successor trustees to take any and all actions necessary to give effect to the terms of the EJ Plan and transactions contemplated thereby;

(g) exculpating and releasing the Directed Parties from any liability for any action or inaction taken in furtherance of, and/or in accordance with the Proposed Order (as defined in the Recognition Motion) or the EJ Plan, except for any liability arising from any action or inaction constituting gross negligence, actual fraud, or willful misconduct as determined by the Court;

(h) waiving the 14-day stay on effectiveness of the Order; and

(i) granting such other and further relief as the Court deems just and proper.

---

[30] "Directed Parties" means DTC (*i.e.*, the record holder of the global notes representing all of the Tranche 2 Notes), the collateral agents under the Indentures, the Trustees, the Trustees' agents, attorneys, successors and assigns, and the Offshore Account Banks (as defined above).

The relief requested in the Recognition Motion is without prejudice to any additional relief the Foreign Representative may request.

58.     As detailed more fully in the Recognition Motion, I believe that there are persuasive reasons for recognition of the Brazilian EJ Proceeding as a foreign main proceeding (or, in the alternative, as a foreign nonmain proceeding).  Brazil is the sole jurisdiction in which the Debtors' businesses can be comprehensively and efficiently restructured given that, as described above, the Debtors are part of a Brazilian enterprise with deep current and historical connections and interests in and to Brazil.  I have been advised by my counsel that the Brazilian EJ Proceeding is a "foreign proceeding" and that I am a proper "foreign representative," as those terms are defined in the Bankruptcy Code.  I have been further advised that the Chapter 15 Cases were duly and properly commenced by filing the Petitions accompanied by all fees, documents, and information required by the Bankruptcy Code and the Bankruptcy Rules, including (a) corporate ownership statements, (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer the Foreign Proceeding of the Debtors, (ii) all parties to litigation pending in the United States in which the Debtors are a party at the time of the filing of the Petitions (there are none), and (iii) all entities against whom provisional relief is sought (there are none), (c) a statement identifying all foreign proceedings that are known to me with respect to the Debtors, and (d) copies of the Initial Court Order, the Chapter 15 Authorizing Resolutions, and the Brazilian Confirmation Order.

59.     In addition, I believe that the additional assistance requested from the Bankruptcy Court (which is summarized above) is appropriate.  The relief requested in the Recognition Motion will give clear direction and authority under U.S. law to the Directed Parties to carry out the requirements of the EJ Plan in accordance with the laws of Brazil and other applicable jurisdictions and the Brazilian Confirmation Order.

60.    My counsel has advised me that the permanent injunctions under sections 1507 and 1521 of the Bankruptcy Code are critical to enjoin entities subject to this Court's jurisdiction from taking action against the Debtors or their property in the territorial jurisdiction of the United States in an attempt to circumvent the terms of the EJ Plan.  Allowing evasion of the terms of the EJ Plan (including the Releases) or the Brazilian Confirmation Order would force the Debtors to defend against these suits, regardless of their merit, thus depleting their resources, prejudicing their reorganized value, and hindering their ability to access U.S. capital markets.  For these reasons, I believe an injunction would support implementation of the EJ Plan and the Brazilian Confirmation Order and would protect the interests of all creditors in having their claims valued and paid on a consistent, non-discriminatory basis as determined by the Brazilian Court.

61.    In addition to the injunction, my counsel has also advised me that the stay is one of the fundamental protections provided by the Bankruptcy Code.  I believe that the Debtors may suffer irreparable harm if a stay of actions in the United States, including actions by recalcitrant creditors, is not granted by the Court.   Also, I believe that any such actions would cause significant disruption to the Debtors and their management during the implementation of the EJ Plan. Preventing actions that could disrupt the Brazilian EJ Proceeding or threaten the Debtors' foreign estates is necessary to ensure the success of the Brazilian EJ Proceeding, which the Debtors anticipate will result in their successful reorganization and a fair distribution to creditors.

62.    I also believe that the Debtors' creditors and other stakeholders will suffer little, if any, harm as a result of the requested relief.  I am advised by counsel that, to the extent that any creditor wished to voice objections to the EJ Plan or the confirmation thereof, such objections could have been brought before the Brazilian Court.  Foreign Law Decl. ¶ 40.  Therefore, the Debtors' creditors will not be adversely affected by a stay in the United States.

63.     I have also requested that the Court cause the Proposed Recognition Order to become effective immediately upon entry, notwithstanding the 14-day stay of effectiveness of that order.  I believe that it is critical for the Debtors to implement the Restructuring as soon as possible, to maintain confidence of suppliers and customers of the Drilling Business.  In addition, I believe it is important that DrillCo receive the proceeds of the New Money Investment as soon as possible and by mid-May, 2023.  This would provide DrillCo with the funding necessary to maintain and modify the Drilling Units to fulfill DrillCo's obligations under the New Drilling Contracts.  In addition, to comply with the existing Drilling Unit Contracts and continue operations, three of the Drilling Units are scheduled for mandatory upgrades this year, and the reorganized Drilling Business will incur CapEx in connection with these upgrades beginning in mid-May.  Waiver of the 14-day stay of effectiveness period is appropriate in these circumstances to allow the Debtors to proceed immediately with the implementation of the Restructuring.

64.     Finally, as described in the Recognition Motion, and as discussed with counsel, I understand and believe that recognizing the Brazilian EJ Proceeding and granting the relief requested therein is consistent with the purpose of chapter 15 of the Bankruptcy Code and the public policy of the United States.  Therefore, I believe that the relief requested is necessary and appropriate and is in the best interests of the Bankruptcy Court, the Debtors, their creditors, and other parties-in-interest.  Therefore, I have directed my United States counsel, Davis Polk, to (a) commence the Chapter 15 Cases and (b) seek (i) recognition of the Brazilian EJ Proceeding as a "foreign main proceeding" or, in the alternative, a "foreign nonmain proceeding," (ii) recognition and enforcement of the EJ Plan and Brazilian Confirmation Order, and (iii) related relief.

## **CONCLUSION**

65.     Based on the foregoing, I believe that the relief requested in these Chapter 15 Cases is well-justified, necessary under the circumstances, in the best interests of the Debtors and their creditors, and should be granted.

*[Remainder of page intentionally left blank; signature page follows]*

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is, to the best of my knowledge, information and belief, complete, true and correct.


Executed on this 11th day of April, 2023
in Rio de Janeiro, State of Rio de Janeiro, Brazil.


*/s/ Rogerio Luis Murat Ibrahim*
Rogerio Luis Murat Ibrahim